IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DELFINO MONARREZ GARCIA, | ) | |
| Plaintiff, | ) ) ) | |
| | ) | No. 12 C 4191 |
| v. | ) ) | |
| | ) | Magistrate Judge Michael T. Mason |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant, Delfino Monarrez Garcia ("Garcia" or "claimant"), has brought a motion

for summary judgment [20] seeking judicial review of the final decision of the

Commissioner of Social Security (the "Commissioner"). The Commissioner denied

Garcia's applications for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i),

423(d), and 1382c(a)(3)(A). The Commissioner filed a cross-motion for summary

judgment [25] asking the court to uphold the previous decision. The court has

jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the

reasons set forth below, Garcia's motion for summary judgment is granted and the

Commissioner's motion is denied.

## I.    BACKGROUND

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for
Commissioner Michael J. Astrue as defendant in this suit.

## A. Procedural History

Garcia filed for DIB and SSI on May 12, 2009, alleging disability beginning November 1, 2007 due to liver disease, esophageal varices, and gastrointestinal bleeding. (R. 156-69.) His claims were denied initially on September 1, 2009, and upon reconsideration on January 6, 2010. (R. 60-68, 70-78.) Thereafter, the claimant filed a timely request for an administrative hearing. (R. 81-82.) The hearing was held on October 19, 2010 before Administrative Law Judge Joel G. Fina. (R. 24.) In addition to testimony from the claimant, the ALJ heard testimony from medical expert Dr. James M. McKenna and vocational expert Thomas A. Gusloff. (R. 24-59.)

On January 5, 2011, ALJ Fina issued a written decision finding that Garcia was not disabled. (R. 9-19.) Garcia filed a timely request for review with the Appeals Council, which was denied on April 13, 2012. (R. 1-3, 138.) The ALJ's decision then became the final decision of the Commissioner. This action followed. The parties subsequently consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c).

## B. Medical Evidence

### 1. Treating Physicians

On November 12, 2007, Garcia was admitted to Provena Mercy Medical Center ("Provena") after vomiting blood. (R. 315.) During his initial exam, Garcia admitted to drinking a six pack of beer a day for the last thirty years. (*Id.*) He denied abdominal pain and had no history of significant medical problems. (*Id.*) The admitting physician noted an elevated heart rate and mild tenderness in the abdomen. (*Id.*) A chest x-ray was unremarkable. (R. 298.) The physician assessed an upper gastrointestinal bleed,

alcohol dependance, and elevated blood sugar, and referred Garcia to Dr. Rafid Hussein in the gastroenterology department. (R. 316.)

Garcia told Dr. Hussein that he felt "nauseated, weak, and tremulous, and generally out of sorts." (R. 317.) Upon examination, Dr. Hussein noted hand tremors. (*Id.*) Dr. Hussein recommended an urgent upper endoscopy to rule out a variceal bleed, delirium tremens protocol, and substance abuse counseling. (R. 317-18.)

The endoscopy "was consistent with lymphoid hyperplasia with a clot in the fundus with no active bleeding noted." (R. 313.) Dr. Hussein found no esophageal varices, but noted that varices can go undetected. (R. 319.) Garcia was given a transfusion of two units of packed red blood cells. (R. 279, 313.) A subsequent CT of the abdomen and pelvis revealed findings compatible with cirrhosis. (R. 296.) A marked thickening of the gallbladder and possible gallbladder sludge or stones were also observed. (*Id.*)

Garcia was discharged on November 16, 2007 with instructions to follow up with his primary care physician and Dr. Hussein. (R. 313.) He was prescribed metformin to control his blood sugar, prilosec, and iron. (*Id.*)

The medical records are silent until May 8, 2009, when Garcia was again admitted to Provena after vomiting blood. (R. 310.) On admission, Garcia exhibited an increased heart rate and borderline low blood pressure. (*Id.*) He denied abdominal pain, chest pain, and shortness of breath. (*Id.*) A chest x-ray was unremarkable, and an electrocardiogram showed normal sinus rhythm. (R. 295, 311.) The physician assessed an acute upper gastrointestinal bleed, a questionable history of cirrhosis, history of alcohol abuse, diabetes, and a questionable history of hypercholesterolemia.

(R. 311.) He referred Garcia to Dr. Raza Hamdani for a gastrointestinal consult. (*Id.*)

Garcia told Dr. Hamdani that he stopped consuming alcohol after his last visit to Provena in 2007. (R. 306.) Dr. Hamdani's examination was primarily unremarkable. (*Id.*) He noted that Garcia was alert and moved "all his extremities normally with normal power." (*Id.*) An abdominal ultrasound revealed gallbladder sludge and thickening of the gallbladder wall. (R. 294.) Dr. Hamdani also assessed an upper gastrointestinal bleed and noted that although there was "no obvious identification of cirrhosis presently," Garcia was at risk for it. (R. 307.)

Dr. Hamdani recommended an emergent endoscopy, which he performed on May 9, 2009. (R. 307-09.) Upon entry, Dr. Hamdani observed extensive esophageal varices, with multiple cherry-red spots in the distal esophagus. (R. 308.) A large quantity of blood was observed in the stomach, but no lesions were present with the exception of mild portal gastropathy. (*Id.*) The duodenum had no active bleeding lesions and no cardiac varices were observed. (*Id.*) Dr. Hamdani thus concluded that the esophageal varices were the most likely source of the bleeding. (*Id.*) Dr. Hamdani then performed a ligation (or banding) procedure, and placed ten bands throughout the esophagus. (*Id.*) Upon removal of the scope, the bands were well placed and no bleeding was observed. (R. 308-09.) Dr. Hamdani noted that Garcia would benefit from "beta blockage long term," additional banding in three weeks, and therapy for alcohol abuse. (R. 309.)

Garcia was discharged on May 11, 2009 with the diagnoses of acute upper gastrointestinal bleed, liver cirrhosis, chronic alcohol abuse, non-insulin dependant

diabetes, and hypercholesterolemia. (R. 302.) He was prescribed imdur and pepcid, advised to stop drinking, and advised to follow up with his primary care physician at Aunt Martha's clinic and Dr. Hamdani. (R. 302-03.) Garcia did not require a blood transfusion during this visit. (R. 302.)

Garcia continued to undergo treatment with Dr. Hamdani as advised. On May 19, 2009, Garcia complained of fatigue. (R. 327.) Dr. Hamdani's physical examination revealed normal results. (*Id.*) He assessed alcoholic cirrhosis of the liver, bleeding varices, and prescribed ranitidine, an antacid. (R. 327-29.) On June 16, 2009, Dr. Hamdani performed a follow-up endoscopy. (R. 300.) Dr. Hamdani noted that the varices had significantly diminished since the first ligation, with very few cherry-red spots, but were still about 8 to 9 centimeters long. (*Id.*) As a result, he performed an additional ligation, during which he placed six bands. (*Id.*) No bleeding was noted, with the exception of a few cubic centimeters of blood. (*Id.*) Dr. Hamdani increased Garcia's beta-blocker dosage and recommended a three week follow-up ligation. (*Id.*)

Garcia returned for a follow-up visit on June 23, 2009 complaining of fatigue. (R. 330.) Dr. Hamdani prescribed glyburide for his diabetes. (R. 331.)

Garcia underwent his third ligation with Dr. Hamdani on July 10, 2009. (R. 299.) Dr. Hamdani observed persistent moderate-sized varices in the distal esophagus, with a few cherry-red spots. (*Id.*) Consequently, Dr. Hamdani placed an additional seven bands. (*Id.*) Dr. Hamdani noted that "[i]t was remarkable that despite 2 sessions of ligations here the patient persists in having significant varices of medium size and very likely requires a followup ligation in 3 weeks." (*Id.*)

5

On July 20, 2009, Garcia told Dr. Hamdani that he was very weak and fatigued. (R. 322.) Dr. Hamdani assessed hepatic encephalopathy, which he noted was "refractory" (or resistant) despite Garcia having been taking lactulose in an attempt to reduce his ammonia levels. (R. 322-23.) Dr. Hamdani further noted that Garcia's cirrhosis was "stable but decompensated," that he needed further ligation, and that his diabetes was controlled with glyburide. (*Id.*)

On July 31, 2009, Garcia underwent a fourth ligation procedure. (R. 350-51.) Dr. Hamdani observed that the varices were still present, but were "much shrunk in size." (R. 350.) A moderate degree of portal gastropathy was observed. (*Id.*) Seven additional bands were successfully placed with no bleeding. (*Id.*) Dr. Hamdani noted that Garcia was at low risk of bleeding because there were no more "cherry-red spots." (*Id.*) Dr. Hamdani further concluded that "at this stage, it appears that we have successfully obliterated [Garcia's] varices." (R. 351.) He advised Garcia to continue taking the beta-blocker and recommended a four month follow-up endoscopy. (*Id.*)

At a routine visit on August 21, 2009, Garcia again complained of fatigue and that it was "difficult to get around." (R. 352.) Dr. Hamdani continued Garcia on lactulose, referred him to the diabetes clinic, and noted that although his cirrhosis was stable, he "may require transplant." (R. 353.)

On September 6, 2009, Garcia returned to Provena complaining of difficulty swallowing, especially hard materials such as meat. (R. 344.) Dr. Hamdani concluded, based on the history of ligations, that Garcia most likely had post-banding strictures, "now presenting with obstruction." (R. 345.) Dr. Hamdani performed an endoscopy, which revealed a large piece of meat in the esophagus. (R. 348.) Dr. Hamdani cleared

6

the obstruction. (*Id.*) He observed small varices and "the early beginnings of stricture at 2 locations in the distal esophagus." (*Id.*) Dr. Hamdani recommended interval dilation and that Garcia be instructed on a pureed diet. (R. 349.)

As of September 8, 2009, Garcia was still very fatigued and sleeping a lot. (R. 355.) On October 2, 2009, a follow-up endoscopy showed small varices that did not require further ligation. (R. 346-47.) A faint stricture was observed, but because of the presence of varices, "it was felt unsafe to dilate the stricture." (R. 347.) Biopsies were taken of an area of mucosal inflammation in the stomach out of concern of possible H. pylori infection or gastric cancer. (R. 346.) Dr. Hamdani advised diet modification, a three month follow-up endoscopy, and the continuation of beta-blocker therapy. (R. 347.)

On November 2, 2009, Garcia complained that he remained tired and still had some difficulty swallowing. (R. 358.) Dr. Hamdani noted that he was still at "high risk" for varice bleeding. (R. 359.) By November 30, 2009, his complaints had subsided. (R. 361-62.) He again complained of difficulty swallowing meats on December 15, 2009. (R. 364.) Dr. Hamdani commented that he was "concerned he may bleed again if he does any heavy lifting" and that "he may not be able to work again." (*Id.*)

Garcia had no complaints apart from "some fatigue" on February 22, 2010 and Dr. Hamdani's examination was unremarkable. (R. 399-400.) On April 22, 2010, Garcia again complained that he had difficulty getting through the day without naps, walking more than a mile, or doing heavy work. (R. 395.) Dr. Hamdani noted that Garcia could not lift heavy loads due to his varices. (R. 396.) Garcia voiced similar

complaints on May 24, 2010, at which time Dr. Hamdani noted that he cannot lift more than ten pounds due to risk of varice bleeding and that he still suffered from medium sized varices. (R. 391.) His complaints of fatigue, dizziness, and weakness continued on June 28, July 29, and August 20, 2010. (R. 376-390.) He continued to take the prescribed beta-blocker. (*Id.*) On June 28, 2010, Dr. Hamdani again advised Garcia not to lift more than ten pounds. (R. 388.) Dr. Hamdani noted on more than one occasion that he could not perform any more banding procedures because of the stricture. (R. 383, 388.) Garcia voiced no complaints at his September 10, 2010 and October 11, 2010 appointments. (R. 371-72.)

As a result of certain inconsistencies eluded to by the medical expert at the hearing, the ALJ left the record open so that Garcia could submit an assessment from Dr. Hamdani, which he did on December 8, 2010. (R. 404-06.) According to Dr. Hamdani's assessment, Garcia had the capacity to perform sedentary work. (R. 405.) Specifically, Dr. Hamdani concluded that Garcia could sit, stand, and walk for three hours in an eight hour workday; could carry and lift ten pounds; and could not engage in fine manipulation, bend over, squat, or stoop. (*Id.*)

### 2.   State Agency Consultants

On August 27, 2009, Dr. Barry Free completed a physical residual functional capacity ("RFC") assessment. (R. 336-43.) Dr. Free concluded that Garcia could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; could stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday; and had no pushing or pulling limitations. (R. 337.) He found no postural, manipulative, visual, communicative, or environmental limitations. (R. 338-40.) On the

8

whole, Dr. Free found that claimant's statements regarding weakness and fatigue were "partially credible in light of the overall evidence," but that the limitations described by the claimant exceeded that supported by the objective medical findings. (R. 343.)

On January 4, 2010, Dr. Vidya Madala affirmed Dr. Free's RFC assessment. (R. 367-69.)

## C.  Medical Expert's Testimony

Medical Expert ("ME") Dr. James M. McKenna appeared telephonically at the hearing. The ALJ first asked the ME whether the record was sufficient for him to reach a conclusion as to Garcia's medical condition. (R. 29.) ME McKenna responded that the record did not include recent ammonia levels or the February 2010 endoscopy report. (R. 29-30.) Notwithstanding this missing information, the ME stated that he would still be able to provide a conclusion regarding Garcia's condition and proceeded to describe his medical history. (R. 30.)

The ME explained that Garcia suffered from alcoholic induced liver disease, namely cirrhosis, dating back to November 12, 2007, his first visit to Provena. (R. 30-31.) He explained that Garcia suffered from both esophageal and rectal varices. (R. 31.) With respect to hepatic encephalopathy, the ME concluded that although Garcia had elevated ammonia levels in the past, and related confusion, the problem was not documented to persist. (*Id.*) The ME described Garcia's diabetes as uncontrolled, but explained that there was no apparent end-to-end damage. (R. 32.)

ME McKenna concluded that Garcia's esophageal bleeds and liver problems did not meet the relevant Listings because the bleeds "were not massive bleeds" and he maintained "pretty good liver function." (R. 32.) He described the diabetes as a

9

"nuisance," which also did not reach listing level. (R. 32-33.)

The ME then pointed out what he viewed as an inconsistency in Dr. Hamdani's opinion regarding Garcia's condition and his ability to lift loads. (R. 33.) He noted that at the April 22, 2010 visit, Dr. Hamdani stated that Garcia had small varices and could not lift heavy loads. (R. 33.) Then, on May 24, 2010, Dr. Hamdani stated that Garcia suffered from medium varices and could not lift more than ten pounds. (*Id.*) Given this inconsistency, the ME told the ALJ that it was "up to us" to pick a level of exertion and concluded that Garcia should be limited to the light level of exertion. (R. 34.) The ME also opined that Garcia must avoid ladders and concentrated exposure to extreme heat and cold. (R. 35.) ME McKenna believed that these limitations dated back to Garcia's onset date of November 1, 2007. (*Id.*)

Plaintiff's counsel then asked the ME why banding procedures are performed. (R. 36.) The ME explained that banding serves to tie off esophageal varices so that they will no longer be present. (*Id.*) Plaintiff's counsel then directed the ME's attention to Dr. Hamdani's December 15, 2009 opinion that Garcia may bleed again if he did any heavy lifting and that he may not be able to work again. (R. 37.) The ME believed that Dr. Hamdani was implying that Garcia would not be able to perform the heavy work that he used to do. (*Id.*)

Next, plaintiff's counsel asked the ME to explain why Dr. Hamdani stated that Garcia's esophageal stricture prohibited further banding or dilation. (R. 38-39.) The ME explained that he believed there was no absolute statement in the record that Garcia could not be dilated, but instead, on one occasion, Dr. Hamdani noted that he could not be dilated due to inflammation. (R. 39.) The ME also explained that Garcia's

10

rectal varices would not further impact Garcia's ability to lift. (R. 40.)

## D. Claimant's Testimony

Garcia appeared at the hearing and testified through an interpreter as follows.

He was born on November 2, 1957, making him 52 years old at the time of the hearing.

(R. 41.) Garcia completed first grade in Mexico. (*Id.*) He came to the United States in

1967. (*Id.*) Garcia speaks only a little English and cannot read or write. (R. 42.) He

resides with his brother, but does not do any chores around the house. (R. 41, 45-46.)

Garcia testified that he last worked in "quality control" at Sealy mattress

company, where he had worked for almost thirteen years. (R. 42-43.) He explained

that he visually inspected each mattress and placed the proper sticker on each one.

(R. 42.) He did not complete written reports. (*Id.*) While inspecting the mattresses, he

had another person help him flip them over because they were heavy and he did not

want to strain himself. (*Id.*) Garcia explained that he also placed the mattresses into a

machine that would wrap them in plastic. (R. 43-44.) He never worked in the

manufacturing department. (R. 44.)

Garcia stated that he gets tired after walking a couple of blocks and feels pain on

his right side. (R. 45.) He testified that his doctor told him not to lift more than twenty

pounds because he could rupture his liver. (*Id.*) As a result, he does not do any lifting

because he "want[s] to be alive." (*Id.*) At times, he has difficulty concentrating. (R. 47.)

He also has difficulty eating because his trachea was "reduced." (*Id.*) He has not

changed his diet and eats steak sometimes. (*Id.*) Garcia testified that he has not

consumed alcohol since he was released from the hospital in 2007. (R. 46.) He has

11

not worked since 2007. (*Id.*)

When asked why he started bleeding in May 2009, he explained that after his first hospital visit in 2007, he did not have any work restrictions. (R. 47.) As a result, he was re-injured and suffered "a strain...inside." (*Id.*)

### E.    Vocational Expert's Testimony

Vocational expert ("VE") Thomas Gusloff also appeared at the hearing. VE Thomas first asked Garcia to clarify his job duties at Sealy. (R. 49.) Garcia explained to the VE that when he inspected the mattresses, he was looking for certain imperfections, such as a tear, dirt, or inadequate filling. (*Id.*) He was not required to fix such imperfections, but instead called someone to remove the mattresses. (*Id.*) He clarified that part of his job was to place the mattresses on the packaging machine, but again testified that he had assistance flipping the mattresses. (*Id.*) He claimed the total load lifted by two people was about 400 pounds. (R. 50.) Garcia did not prepare shipping information. (R. 49-50.) He stated that it took him three months to learn the duties of the position at Sealy. (R. 50.)

The VE then classified Garcia's position at Sealy, explaining it seemed like he did a combination of the inspector II position (light, semi-skilled) and the machine packager position (medium, unskilled). (R. 52, 54.) However, based on Garcia's testimony regarding the weight of the mattresses, the VE concluded that Garcia performed the work at a heavy level of exertion. (R. 52.) And, because Garcia spent fifteen to twenty minutes inspecting each mattress, the VE concluded that the position was semi-skilled. (R. 53-54.)

12

The ALJ then asked the VE to consider a person of Garcia's age, education, and work-experience who could lift twenty pounds occasionally, ten pounds frequently, could never climb ladders, ropes or scaffolds, and must avoid concentrated exposure to extreme cold and heat. (R. 54.) The VE explained that such an individual would be able to perform the inspector II position as defined in the Dictionary of Occupational Titles and nationally, but not as Garcia performed the work. (*Id.*) The VE further explained that there would be no transferable skills from the inspector II position. (*Id.*) The VE concluded that the individual could perform other jobs at the light level, such as assembler for small products, cafeteria attendant, and a hand packager, all of which were unskilled positions. (R. 55.)

Next, the ALJ asked the VE to consider the same hypothetical individual, but with the exertional capacity to perform only sedentary work, and asked whether the individual would be precluded from work based on the grid rules. (R. 55.) The VE responded that such an individual would have no transferable skills and would be precluded from work at age 50. (*Id.*) If the individual were under 50, he could perform other sedentary, unskilled positions. (*Id.*) The VE also concluded that such an individual would be unable to perform claimant's past work. (R. 56.)

Lastly, the ALJ asked the VE to consider the first hypothetical individual he described and asked whether that individual could perform work if he was incapable of communicating in English. (R. 56.) The VE explained that the individual could perform the light, unskilled positions he described because they did not require the ability to communicate in English. (R. 56-57.)

13

## II.    LEGAL ANALYSIS

### A.    Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (*quoting Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). And, although the ALJ is not required to address every piece of evidence, he must "build an accurate and logical bridge" from the evidence to his conclusion. *Clifford*, 227 F.3d at 872. Further, the ALJ must sufficiently articulate his assessment of the evidence to assure us that he "considered the important evidence" and to enable the court to "trace the path" of his reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

### B.    Analysis under the Social Security Act

To qualify for benefits, a claimant must be "disabled" under the Act. A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment...which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To determine if a claimant is

14

disabled, the ALJ must consider the following five step analysis: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). At step five, the burden shifts to the Commissioner. *Id.*

ALJ Fina applied this five step analysis. At step one, he determined that Garcia had not engaged in substantial gainful activity since November 1, 2007, the alleged onset date. (R. 14.) At step two, the ALJ found Garcia suffered from the following severe impairments: cirrhosis of the liver secondary to alcohol abuse, esophageal varices secondary to alcohol abuse, and chronic alcohol abuse. (*Id.*) Next, at step three, ALJ Fina concluded that Garcia does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14-16.)

ALJ Fina went on to assess Garcia's RFC and concluded that Garcia can perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with certain limitations.[2] (R. 16-18.) Specifically, the ALJ found that Garcia can lift a maximum of

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b).

twenty pounds occasionally, and ten pounds frequently; can stand and/or walk for six hours and sit for six hours in an eight-hour workday; can push and/or pull, including to operate hand and foot controls as restricted by his carrying and lifting limitations; can never climb ropes, ladders or scaffolds; and must avoid concentrated exposure to cold and heat. (*Id.*) Based on this RFC, the ALJ concluded that Garcia could perform his past relevant work in the inspector II position as it is generally performed. (R. 18.) As a result, the ALJ determined that Garcia was not disabled under the Act.

Garcia now argues that the ALJ failed to properly evaluate (1) the opinion of Dr. Hamdani; (2) his complaints of fatigue; (3) his credibility; and (4) his past relevant work. We address each issue in turn below.

### C.     The ALJ Failed to Properly Consider the Opinion of the Treating Physician.

Garcia first argues that the ALJ failed to properly assess the opinion of his treating physician, Dr. Hamdani. Again, on December 6, 2010, Dr. Hamdani concluded that Garcia could sit, stand, and walk for three hours in an eight hour day, could carry and lift ten pounds, and could not engage in fine manipulation, bend over, squat, or stoop. (R. 405.) ALJ Fina gave Dr. Hamdani's opinion "little weight" finding it "conclusory" because Dr. Hamdani "submitted it without any supporting documentation and the available objective evidence does not support it." (R. 18.) He also stated that the lifting limitations set forth by Dr. Hamdani were contradicted by Garcia's testimony and that the fine manipulation limitations were not supported by objective evidence. (*Id.*) Like Garcia, we find the ALJ's treatment of Dr. Hamdani's opinion requires

_____

and 416.967(b).

16

remand.

As a general matter, the ALJ will give the opinion of a treating physician controlling weight because treating physicians are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(c)(2). However, "[a] treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'consistent with substantial evidence in the record.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (*quoting* 20 C.F.R. § 404.1527(c)(2)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine what amount of weight to afford the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*citing* 20 C.F.R. § 404.1527(c)(2)). The ALJ must always give "good reasons" for his determination as to the amount of weight given. 20 C.F.R. § 404.1527(c)(2). The ALJ "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Here, we conclude that the ALJ's proffered reasons for affording Dr. Hamdani's opinion "little weight" are insufficient and not supported by substantial evidence. First, the ALJ's finding that Dr. Hamdani's opinion was conclusory and without support cannot stand in the face of the treatment records submitted that document Dr. Hamdani's

treatment of Garcia over a year and a half period. Those records set forth Garcia's symptoms, the treatment plan, including the banding procedures and prescribed medications, and Dr. Hamdani's contemporaneous recommendations as to Garcia's abilities. The record also includes various CT scans and other laboratory results ordered by Dr. Hamdani. How, in the face of these records, the ALJ could find Dr. Hamdani's opinion "conclusory" and without supporting documentation is unclear.[3] Further, the ALJ does not offer any explanation as to why he concluded that the "available objective evidence does not support [Dr Hamdani's opinion]." *See Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008) (noting that at the very least, the ALJ must "minimally articulate" his reasons for discounting a treating physician's opinion).

Next, the ALJ states that Garcia's testimony that his doctors told him not to lift twenty pounds conflicts with Dr. Hamdani's conclusion that Garcia can only lift ten pounds. However, the fact that Garcia may have misstated Dr. Hamdani's orders does not necessarily render Dr. Hamdani's flawed, especially where the contemporaneous treatment notes reveal that Dr. Hamdani concluded on more than one occasion that Garcia could not lift over ten pounds. More importantly, Garcia did not testify that he could in fact lift twenty pounds. Instead, he said he does no lifting out of fear of injuring himself further. Thus, Dr. Hamdani's opinion does not conflict with Garcia's own testimony regarding his abilities.

After concluding that Dr. Hamdani's opinion was not entitled to controlling weight, the ALJ also failed to adequately consider the factors set forth in 20 C.F.R. §

---

[3] While we note that Dr. Hamdani's conclusion regarding Garcia's fine manipulative limitations does not appear to have support in the record, this alone does not cure the ALJ's error on this issue.

404.1527(c)(2), such as the frequency, length, nature, and extent of the treatment

relationship, frequency of examination, the physician's specialty, the types of tests

performed, and the consistency and supportability of the physician's opinion. *See*

*Moss*, 555 F.3d at 561. On remand, if the ALJ again concludes that Dr. Hamdani's

opinion is not entitled to controlling weight, he must consider these factors in

determining what amount of weight to afford the opinion.

D.    **The ALJ Failed to Properly Consider Garcia's Complaints of Fatigue and Failed to Properly Assess his Credibility.**

Next, Garcia argues that the ALJ failed to consider his continuous allegations of

fatigue when assessing his RFC. As Garcia points out, he complained of fatigue,

weakness, and difficulty getting through the day without naps at numerous

appointments with Dr. Hamdani. Unfortunately, the ALJ did not sufficiently address

these complaints.

The RFC is the most a claimant can still do despite his limitations. 20 C.F.R. §

404.1545(a)(1). When determining a claimant's RFC, the ALJ must consider all of the

relevant evidence in the case record, including information about symptoms that might

not be shown by objective medical evidence alone. 20 C.F.R. § 404.1545(a)(3); SSR

96-8p, 1996 WL 374184, at *5. A court will uphold an ALJ's decision "if the evidence

supports the decision and the ALJ explains his analysis of the evidence with enough

detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th

Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).

Here, although the ALJ referenced Garcia's complaints of fatigue in his step

three finding, he failed to offer any explanation as to how fatigue might affect Garcia's

ability to work, if at all. This warrants remand. *See Arnett*, 676 F.3d at 592 ("Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence.").

This shortcoming ties directly into the ALJ's credibility finding. We note that the ALJ's use of boilerplate language is at least accompanied with some reasoned analysis.[4] *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (noting that the inclusion of boilerplate language may be harmless if the ALJ otherwise explains his conclusion). However, having failed to explain why Garcia's well documented complaints of fatigue were incredible, we must remand on this issue for further consideration. *See Myles v. Astrue*, 582 F.3d 672, 676-77 (7th Cir. 2009) (remanding where, among other things, the ALJ failed to articulate reasons for rejecting claimant's allegations of fatigue).

### E. The ALJ Erred at Step Four When He Determined that Garcia Could Perform his Past Position as it was Generally Performed.

Lastly, Garcia takes issue with the ALJ's step four finding. As explained above, ALJ Fina determined that Garcia could "perform his past relevant work as an inspector II [as] it [is] generally performed." (R. 18.) According to Garcia, because his past position at Sealy was actually a composite job, that is, a combination of the inspector II and machine packaging positions, the ALJ's decision at step four requires reversal. We agree.

---

[4] Unlike Garcia, we do not view the ALJ's references to certain inconsistencies in his testimony as a mischaracterization of the record.

As a general matter, a claimant is not disabled if he maintains the RFC to perform his past relevant work either as he actually performed it *or* as it is generally performed in the national economy. SSR 82-61, 1982 WL 31387, at *2; *see also* 20 C.F.R. § 404.1560(b)(2). However, in the case of a "composite job," which has "significant elements of two or more occupations," there is no equivalent in the Dictionary of Occupational Titles.[5] SSR 82-61 at *2. Instead composite jobs must be "evaluated according to the particular facts of each individual case." *Id.*

Here, the VE specifically testified that Garcia's past relevant work at Sealy was a combination of the inspector II position (light, semi-skilled) and the machine packager position (medium, unskilled), supporting a finding that the position was a composite job. He explained that Garcia performed the position at a "very heavy level," and that he could no longer perform the position as he performed it.

Unfortunately, the ALJ ignored the fact that Garcia appears to have had a composite job and described his past relevant work as two separate positions. He then concluded that Garcia could perform the inspector II position as it is generally performed (light level of exertion), and was thus not disabled. Like Garcia, we find the

_____

[5] As set forth in the Program Operations Manual System ("POMS"), a handbook for internal use at the Social Security Administration, "if [the ALJ] can accurately describe the main duties of [past relevant work] only by considering multiple DOT occupations, the claimant may have performed a composite job. POMS DI 25005.020(B). POMS further provides that because a composite job does not have a DOT counterpart, the ALJ should "not evaluate it at the part of step 4 considering work 'as generally performed in the national economy.'" *Id.* Although POMS has no legal force and is not controlling, *Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989), some courts have at times described POMS as at least persuasive. *See e.g., Thompson v. Astrue*, 11C 472, 2013 WL 393290, at *4 (N.D. Ind. Jan. 31, 2013) (collecting cases).

case of *Peterson v. Astrue*, No. 09-209, 2010 WL 3219293 (N.D. Ind. Aug. 12, 2010) to be persuasive. There, the District Court reversed the ALJ's decision under similar circumstances, concluding that an ALJ "may not deem a claimant capable of performing past relevant work by dividing the demands of a composite job into two separate jobs and finding her capable of performing the less demanding of the two jobs." *Id.* at *5 (quotation omitted).

Like the *Peterson* court, we conclude that the ALJ's step four finding requires reversal. We reject the Commissioner's argument that the ALJ's step four finding is harmless error given the VE's testimony that Garcia could perform other work in the national economy. Not only are there other errors requiring remand here, the ALJ did not make a step five finding and we cannot simply "fill that gap." *Getch v. Astrue*, 539 F.3d 473, 481 (7th Cir. 2008).

## III.    CONCLUSION

For the reasons set forth above, Garcia's motion for summary judgment is granted and the Comissioner's motion is denied. This case is remanded to the Social Security Administration for proceedings consistent with this Opinion. It is so ordered.


**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**


**Dated: June 28, 2013**

22